420 S.E.2d 732

**Robert Carl CRAIN, et al., Appellants,**

v.

**Donald E. BORDENKIRCHER, Warden, West Virginia Penitentiary, et al., Appellees.**

No. 16646.

Supreme Court of Appeals of West Virginia.

Submitted June 2, 1992.

Decided June 25, 1992.

James F. Companion, William D. Wilmoth, Barbara L. Baxter, Schrader, Byrd, Byrum and Companion, Wheeling, for appellants.

Mario J. Palumbo, Atty. Gen., Rita Stuart, Asst. Atty. Gen., Charleston, for appellees.

NEELY, Judge:

On 2 June 1992, as part of the on-going requirement to inform this Court concerning the construction of and transition to a new penitentiary (*Crain v. Bordenkircher,* 181 W.Va. 231, 233, 382 S.E.2d 68, 70 (1989) (*Crain IV*)), the Court heard a status report. In addition to providing information, the respondents also requested that we modify our order dated 30 November 1988

closing the West Virginia Penitentiary at Moundsville (WVP) on 1 July 1992 (*Crain v. Bordenkircher*, 180 W.Va. 246, 248, 376 S.E.2d 140, 142 (1988) (*Crain III*)), by extending the closure date for an additional twenty-seven months to complete the construction of and transition to a new penitentiary at Mount Olive (Mount Olive). Because the construction of Mount Olive is scheduled for completion in less than two (2) years, the closure date for WVP as a maximum security facility for dangerous offenders is extended until 1 July 1994. During the interim, this Court continues to require the respondents to provide detailed information and continues this case for further action until 4 November 1992.

### I

This proceeding originated in 1981 when the inmates at the WVP sought a writ of habeas corpus contending that their confinement in the penitentiary constituted cruel and unusual punishment in violation of the Eighth Amendment to the *Constitution of the United States* and *W.Va. Const.*, Art. III, § 5. This Court appointed a special master and the special master found that the conditions at WVP constituted cruel and unusual punishment. The special master also made certain recommendations to bring the WVP's conditions within constitutional standards. *Crain v. Bordenkircher*, 176 W.Va. 338, 342 S.E.2d 422 (1986) (*Crain I*).[1] After the West Virginia Department of Corrections, the body charged with managing the penitentiary, failed to comply with the special master's recommendations, we issued a rule to show cause regarding the appointment of a receiver for the construction of a new penitentiary and ordered WVP closed by 1 July 1992. *Crain III, supra.*

Although the respondents assured us that the WVP would be replaced by 1 July 1992, on 30 November 1988 we required the respondents to submit a plan containing specific proposals and to report to us periodically with information regarding progress. *Crain IV, supra.* The status of the new penitentiary was reported in *Crain v. Bordenkircher*, 182 W.Va. 787, 392 S.E.2d 227, 230 (1990) (*Crain V*) (finding adequate progress "to comply with the mandates of the Court"), *Crain v. Bordenkircher*, 185 W.Va. 603, 408 S.E.2d 355 (1991) (*Crain VI*) (directing that the special master receive the plans, policies, procedures and arrangement to staff the new penitentiary), and *Crain v. Bordenkircher*, No. 16646 Filed February 27, 1992 (per curiam order) (*Crain VII*) (noting that the bids for the construction phase of the project were over budget by about $7,000,000). In *Crain VII*, we continued the case until 5 May 1992 to receive additional information on the project. *Crain VII, id.* at 2–3.[2]

### II

On 2 June 1992, the parties submitted a report on the final modification of the construction plans and the costs. The changes in the plans were submitted to our special master and to the petitioners' counsel. By letter dated May 19, 1992, the special master said that the final plans were satisfactory and on this basis the bids were re-let and the new bids approved. Although the respondents did not respond to the petitioners' comments until the 2 June 1992 report, the petitioners, by letter dated 15 June 1992, said that except for two matters, their concerns were alleviated.[3]

---

1. In *Crain v. Bordenkircher*, 178 W.Va. 96, 357 S.E.2d 778 (1987) (*Crain II*), we held that the fees and expenses of the monitor should be paid by the Department of Corrections.

2. By order dated 25 March 1992, the case was continued until 2 June 1992.

3. In the 15 June 1992 letter, counsel for the petitioners expressed concern about the follow-

ing: (1) the requested twenty-seven (27) month extension rather than the actual time needed for construction (*See infra* pp. 734–35, for a discussion of the extension), and (2) the amount of recreation time for inmates in Mount Olive (*See infra* pp. 734–35, for a discussion of the operational plans).

The new bids on the modified plans for the next construction phase of Mount Olive (Phase III) amounted to $40,093,000. Although these bids were $3,639,913 less than the comparable bids received on 22 January 1992, the bids still exceeded the estimated cost of Phase III by about $3,500,000. However, the low bids for Phase III were accepted and after the contractors provide documentation of insurance and bonds, the respondents anticipate that the final issuance, approval and encumbrance of contracts will take about two weeks and then the contractors will be told to proceed. On 1 June 1992, a pre-construction meeting was held to coordinate the start of Phase III construction.

The respondents said that the increased costs for Phase III would be paid for out of the interest earned on the proceeds from already issued bonds to finance this and several other projects.[4] The bonds earned about $10,000,000 in interest and about $6,000,000 of the interest is available to cover additional costs of the projects financed by the bonds. About half of the available interest has been dedicated to paying the over-budget bids for Phase III.

The Phase III construction contracts provide for a six hundred (600) day construction period for substantial contract completion with an additional thirty (30) days for final completion. The contracts also provide liquidated damages of $1000 for each day construction continues beyond the scheduled completion of the facilities. Any further changes in the final plans, by way of work orders, must be submitted to our special master for his approval. The Division of Corrections will use the construction period to develop a transition plan to Mount Olive to avoid further delays.

■ Citing a need for an orderly transfer of inmates and to provide for construc-

tion delays, the respondents, in the present proceeding, request that we modify our closure order to allow an additional twenty-seven months from the date the contractors receive their notices to proceed. Although we recognize that our closure order must be modified to allow retention of inmates pending construction of the new penitentiary, we note that the construction contracts call for substantial completion in six hundred (600) days with final completion in an additional thirty (30) days. Based on the anticipated construction period, an additional delay of closure for twenty-four (24) months is justified and, therefore, we stay our closure order until 1 July 1994 to allow an additional two (2) years to complete the construction of and transfer to the new penitentiary.

### III

We remind the respondents that eleven years have passed since this case began; nine years since Judge Arthur Recht declared the prison conditions to be unconstitutional; six years since our first opinion in *Crain I;* and, four years since we ordered the prison closed by the 1 July 1992 (*Crain III*). Although we recognize that the respondents are now taking all reasonable steps to comply with this Court's orders, because of the unconstitutional nature of WVP's conditions, we continue to require that these conditions be eliminated as soon as possible.

In order to insure that the transition be made as efficiently as possible, we remind the respondents that the plans, policies, procedures and arrangements to staff the new penitentiary must be submitted to the special master (*Crain VI*) for review and comment. The preliminary plans submitted by the respondents to this Court on

---

4. The Series A Bonds were to finance the following projects at the approved amount:

| PROJECT | PROJECT AMOUNT |
| --- | --- |
| Mount Olive Correctional Complex | $ 46,200,000.00 |
| Northern Regional Jail & Correctional Facility | 19,082,000.00 |
| South Central Regional Jail | 16,063,500.00 |
| Central Regional Jail | 10,360.800.00 |
| Southern Regional Jail | 17,669,800.00 |
| Eastern Regional Jail | 4,897,600.00* |
| Sub–Total | $114,273,700.00 |

* The Regional Jail and Correctional Facility Authority amended the list of projects by substituting the Huttonsville Corrections Center for the Eastern Regional Jail without altering the allocated funds.

31 January 1992 are incomplete and inadequate. Our special master has advised the respondents of his concerns with the preliminary plans. However, we have not received any additional material from the respondents. Because the Division of Corrections must submit its budget request in advance of each fiscal year in August, the respondents must complete the plans in order to have the necessary funds in the budget. In order to insure that the funds are budgeted, the respondents are ordered to submit to the special master a revised preliminary plan by 1 October 1992 so that the special master's comments on the plan are available at the next status report to the Court. The process of development and review of these plans should not delay the targeted operational date for Mount Olive, 1 July 1994, the closure date for the WVP.

█ We also remind the respondents of their "statutory obligation to establish and maintain programs of classification, education, and treatment of inmates and that such programs must comply with the standards established by the American Correctional Association and the Commission on Accreditation for Corrections [hereinafter 'ACA Standards']. (Footnote omitted.)" *Crain I* 176 W.Va. at 356, 342 S.E.2d at 440–41; *see also Cooper v. Gwinn,* 171 W.Va. 245, 259, 298 S.E.2d 781, 795 (1981) ("rehabilitation is the primary purpose of confinement in state prisons ..."). Because of the respondents' obligation to provide a rehabilitation program for the inmates, the respondents are to submit comprehensive plans for education and rehabilitation that conforms with ACA Standards for these programs to the special master by 1 October 1992 in order to have the master's comments available at the next status hearing. *See Crain I* 176 W.Va. at 356–58, 342 S.E.2d at 440–42 for a discussion of the ACA Standards.

In addition the respondents are to include in the materials submitted to the special master by 1 October 1992 the administrative plans and policies for health care. The respondents should also include in the report to the special master and the next status report the proposed budgets for the rehabilitation and health care plans along with any other materials to be submitted to the legislature.

IV

Because of the delay in the construction of and transition to the new penitentiary, we are concerned about the overcrowding in the correctional system. The new penitentiary, an 800–bed facility, is to replace WVP, a 550–bed facility. During the 2 June 1992 hearing, Colonel Nicholas Hun of the Division of Corrections said that because of a lack of state prison facilities on 2 June 1992 about 354 felony inmates were incarcerated in county facilities at an average cost of $25 per inmate per day. Colonel Hun said that the number of felony inmates in county jails had been reduced from 400 a few weeks earlier; however, the reduction is temporary because of the sentencing of additional persons.

In response to the Court's questions about how to reduce the number of State inmates housed in county jails, Colonel Hun noted that several additional facilities are scheduled to open in the near future. A 100–bed addition is planned for Huttonsville Correctional Center. The Huttonsville project is to be financed by the Authority's first bond series, the same bonds financing the new penitentiary, and bids on the Huttonsville project are to be opened on 1 July 1992 and project's completion is expected by October 1992. Additional facilities also scheduled for completion include the Braxton Regional Jail (6 months), Kanawha Regional Jail (9 months), and the Raleigh Regional Jail (20 months). The Court also requested information on other plans that respondents had for inmates who are minimum security risks.

The housing of inmates in county jails has shifted at least part of the cost of housing from the State, Division of Corrections, to the counties.[5] Colonel Hun said

5. To seek reimbursement for a state inmate housed in a county's facility, the county must file a claim for expenses with the Court of Claims, which in *County Comm'n of Mineral*

that the budget for county-held inmates would be depleted in October 1992, only 4 months into the 1993 fiscal year. Senate Concurrent Resolution No. 30, the resolution authorizing the sale of the bonds used to finance the new penitentiary and other projects, allows the proceeds from the sale of the bonds to be used "for any and all purposes, costs, and expenses of any nature whatsoever under the [Regional Jail and Correctional Facility Authority] Act...." At this time a majority of the Court (Justice Brotherton, dissenting) does not find it appropriate to use the bond proceeds not dedicated to a facility construction project, about $3,000,000, to reimburse the counties for cost of housing State inmates. Further, we do not pass on the legality of using bond proceeds to pay the costs of housing state inmates in county facilities.

However, the Court wants to receive information on the problem to determine if this use of the bond proceeds is justified. Therefore, the respondents are ordered to include in the next status report information on the number and location of the State inmates held in county jails, the costs and reimbursement for such inmates, and the proposed budget for reimbursement from the Division of Corrections. The status report should also include information of the construction of additional facilities for the housing of State inmates and other strategies to reduce the number of inmates held in county facilities.

Finally we require that these reports be submitted to our special master by 1 October 1992 and we set this matter for further hearing before this Court on 4 November 1992.

Writ Granted as Moulded.

County v. Division of Corrections, No. CC–89–34 (Ct. of Claims, filed November 21, 1990 and December 19, 1990), held that the Division of Corrections is obligated to reimburse the counties for expense of housing state inmates in county facilities. After the Court of Claims grants the county an award for these expenses, the award is included in the claims bill that must be adopted by the legislature. This procedure requires the counties to pay the expenses and to wait at least a year for the State to reimburse them.