445 S.E.2d 730

Robert Carl CRAIN, et al., Petitioners
Below, Appellants,

v.

Donald E. BORDENKIRCHER, Warden,
West Virginia Penitentiary, et al.,
Respondents Below, Appellees.

No. 16646.

Supreme Court of Appeals of
West Virginia.

Submitted April 12, 1994.

Decided May 20, 1994.

James F. Companion, Schrader, Recht,
Byrd, Byrum & Companion, Barbara L. Bax-
ter, W. Va. Legal Services Plan, Inc., Wheel-
ing, for appellants.

Rita A. Stuart, Sp. Asst. Atty. Gen., W. Va.
Dept. of Corrections, Charleston, for appel-
lees.

PER CURIAM:

Our previous opinion of *Crain v. Borden-
kircher,* 189 W.Va. 588, 433 S.E.2d 526 (1993)
(*Crain X*), decided on July 16, 1993, dealt
with the status of the operational and admin-
istrative plans for the Mount Olive Correc-
tional Complex (MOCC). The MOCC is be-
ing built to correct the constitutional defi-
ciencies that existed at the Moundsville Peni-
tentiary and that were discussed in *Crain v.
Bordenkircher,* 176 W.Va. 338, 342 S.E.2d
422 (1986) (*Crain I*).[1]

■ In *Crain X,* we cited our traditional
Syllabus:

"'This Court has a duty to take such
actions as are necessary to protect and
guard the Constitution of the United
States and the Constitution of the State of
West Virginia.' Syllabus Point 2, *Crain v.
Bordenkircher,* 180 W.Va. 246, 376 S.E.2d
140 (1988)."

We found in *Crain X* that the parties
reached substantial agreement on various
phases of the operational plan.[2] The parties

1. In *Crain v. Bordenkircher,* 187 W.Va. 596, 420
S.E.2d 732 (1992) (*Crain VIII*), we summarized
our various opinions since *Crain I* which dealt
with the construction of the MOCC.

2. The respondents who are members of the Divi-
sion of Corrections submitted a status report in
*Crain X,* 189 W.Va. at 589, 433 S.E.2d at 527,
which we summarized:

also asked to be allowed to have this Court's Special Master [3] arbitrate any remaining differences as to the plan. We granted this request and set a return date for a further status hearing on January 11, 1994.[4]

On February 25, 1994, the parties submitted to us a Joint Status Report (Report). The Report covers a number of items. First, the parties "have agreed that the operational procedures will follow ACA (American Correctional Association) Guidelines." [5] The respondents also state that it is their goal to seek ACA accreditation of the medical services "within one year of opening" of the MOCC. This accreditation will be done through the National Commission on Correctional Health Care (NCCHC).

Another area of agreement is that the MOCC "will operate under a system of Unit Management which enables the staff and inmates to work together as a team." The Report outlines some of the concepts of the unit management system. It goes on to state that "the current disciplinary system will be revised to accommodate unit management."

A third area of agreement in the Report describes the system of "employee recruit-ment, selection, and training." This system is designed to "raise the standards and increase the professionalism of the staff at the [MOCC]." [6]

There were additional matters of a more general nature contained in the Report. For instance, the parties agreed that the inmate classification system would be revised. It also stated that "[m]edical and food services will be provided by contract." It was agreed that "[t]he vendors will be required to meet ACA and NCCHC Standards." The Report anticipated that these contracts would be offered for bid in two months.

After hearing this matter on March 1, 1994, we issued an order dated March 3, 1994, where we identified additional information that we desired to have.[7] We set this matter for a further hearing on April 12, 1994.

An additional status report was submitted by the respondents. This report identified other operational procedures which were completed and approved by the parties and our Special Master. These procedures included fire evacuation, use of force and firearm safety, drug and alcohol abuse testing, inmate property office, and inmate payroll

"In their status report, the respondents state that the parties are in substantial agreement as to the following areas of the operational plan: (1) emergency services; (2) security and control; (3) access to the law library; (4) showers for disciplinary segregated inmates; (5) inmate benefit funds; and (6) good time credit. The respondents also stated that the Division of Corrections would seek American Correctional Association (ACA) accreditation for the Mount Olive facility within six to nine months after opening the facility." (Footnote omitted).

3. In *Crain I*, we assigned a Special Master to review the compliance plan and report recommendations to this Court. Patrick D. McManus, a nationally recognized penologist, was appointed to this position. The Special Master's reports and recommendations substantially aided and guided this Court throughout this litigation.

4. Subsequently, this hearing was continued until March 1, 1994, and the matter was set for further hearing on April 12, 1994.

5. There is a caveat to the foregoing in that the petitioners "reserve the right to object to any procedure that is in accordance with ACA Stan-

dards but contrary to the Consent Decree or other prior Court Orders in *Crain*."

6. The basic outline of the training program as set out in the Report is:

"Every new Correctional Officer will be hired under the Bureau of Labor Apprenticeship Program. This program requires approximately 4,000 hours of training and 250 hours of studies. Upon completion, the employee will receive a Journeyman's Certificate. After successful completion of the Apprenticeship Program and Academy training, the employee will receive approximately 32 hours of credit toward an Associate Degree in Criminal Justice. Those credits can be applied toward a degree at West Virginia State College."

7. The additional information included:

"(1) [T]he nature or subject matter of the remaining portions of the plan which have been completed; (2) the nature or subject matter of the areas on which there is agreement by the parties; and (3) the nature or subject matter of the areas on which there is disagreement by the parties. It is further considered and ordered that (1) the parties shall, on or before the 31st day of March, 1994, mediate their

and accounting procedures. Moreover, the respondents assert that all operational procedures "for programs and treatments have been reviewed and approved."

The respondents continue to state that additional work is to be done to complete the final operational procedures for medical and food services. However, they note, as we earlier observed, that these services will be provided under contract and will meet applicable ACA and NCCHC standards. The respondents also report that revisions to the disciplinary procedure will reflect the unit management concept and that classification guidelines are being modified to cover changes suggested by the Special Master. The respondents state that the revisions of these latter two procedures will be sent to the Special Master and to the petitioners' counsel on April 15, 1994, for their review.

The respondents also represent that the parties and the Special Master met and agreed that improved visitation and improved accessibility to the law library and all other programs at the MOCC will be achieved "by eliminating the protective custody population" from the facility. This move will eliminate the lockdown of the prison population in order "to allow protective custody inmates access to programs and facilities." The respondents assert that a protective custody unit will be established for the Division of Corrections at a different facility.

■ Finally, the petitioners and the respondents disagree on two areas of the operational plan. The first involves the respondents' monitoring of the inmates' telephone calls under the authority contained in W.Va. Code, 25–1–17 (1990).[8] This monitoring will be done by installing an automatic digital recording device. The calls will be stored in a secure computer terminal which only can be accessed by the Commissioner of Corrections or the Commissioner's designee.[9]

The other point of disagreement is over the respondents' proposal that the prisoners' outgoing mail carry the name "Mount Olive Correctional Facility" as a part of the return address. This policy is in effect at all other Division of Corrections facilities.

These two matters were submitted to the Special Master for his determination. In a response dated April 11, 1994, the Special Master advised the parties and this Court that he concurs with the respondents' proposals. He finds that they constitute reasonable correctional policy. We accept the Special Master's recommendation.

In order to make certain that these regulations and policies are completed before the MOCC is opened, we set this matter for a

---

areas of disagreement with the Special Master[.]"

8. The material portions of W.Va.Code, 25–1–17, are:

"(a) The commissioner of corrections or his or her designee shall have authority to monitor, intercept, record, and disclose any telephone calls from an adult inmate or patient of any state penal or correctional institution in accordance with the following provisions:

"(1) All adult inmates or patients of the state penal or correctional institutions shall be notified in writing that their telephone conversations may be monitored, intercepted, recorded, and disclosed;

"(2) Except as provided for in this subsection, only the commissioner and his or her designee shall have access to any such recordings of telephone calls;

"(3) A notice shall be prominently placed on or immediately near every telephone on which monitoring may take place;

"(4) The contents of a telephone conversation shall be disclosed only if the disclosure is:

"(A) Necessary to safeguard the orderly operation of the penal or correctional institution;

"(B) Necessary for the investigation of a crime;

"(C) Necessary for the prevention of a crime;

"(D) Necessary for the prosecution of a crime; or

"(E) Required by an order of a court of competent jurisdiction;

"(5) All recordings of telephone conversations, unless being disclosed in accordance with the preceding subdivision, shall be destroyed within twelve months after the recording; and

"(6) To safeguard the sanctity of the attorney-client privilege, a separate telephone line shall be made available and no conversation between an inmate or patient and an attorney shall be monitored, intercepted, recorded or disclosed in any manner."

9. We do not attempt to describe the entire policy. It does require a log to be kept of any calls that actually are accessed. Moreover, the policy also provides inmates with a separate telephone where calls to or from attorneys may be made or received which will not be monitored.

further hearing on June 28, 1994, at which time we expect the parties to report that all matters are completed.[10] In the event any disagreements should arise, the parties immediately should report the same to the Special Master for resolution.

Relief directed and hearing scheduled.

10. The report also should include the completion date for the MOCC.