454 S.E.2d 108

**Robert Carl CRAIN, et al., Petitioners Below, Appellees,**

v.

**Donald E. BORDENKIRCHER, Warden, et al., Respondents Below, Appellants.**

**No. 16646.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 14, 1994.

Decided Dec. 15, 1994.

James F. Companion, Schrader, Recht, Byrd, Companion & Gurley, Barbara L. Baxter, West Virginia Legal Services Plan, Inc., Wheeling, for appellees.

Rita A. Stuart, Sp. Asst. Atty. Gen., Charleston, for appellants.

WORKMAN, Justice:

This case is before the Court upon the appeal of Donald E. Bordenkircher, as Warden for the West Virginia Penitentiary ("Penitentiary"), et al.,[1] ("Appellants"), from the September 2, 1993, memorandum order of the Circuit Court of Marshall County[2] which granted a "credit on sentence" from the minimum term of indeterminate sentences or from the fixed term of determinate sentences of inmates who have or will have served time at the Penitentiary after July 1, 1992. After reviewing this matter, we conclude that the circuit court's ruling was in error, and accordingly, we reverse.

On February 2, 1993, the Appellees, Robert Crain and other Penitentiary inmates, filed a motion for time cuts with the circuit court, wherein they sought the following relief:

1. Reduced parole eligibility dates for all qualified inmates,

2. Reduced discharge dates for all qualified inmates, and

3. Setting parole eligibility dates for those inmates serving life without mercy sentences.

After considering the written memoranda of the parties on the issue, the circuit court issued the following order:

It is ADJUDGED and ORDERED that all inmates now in the custody of the Commissioner of Corrections, or hereafter committed to the custody of the Commissioner of Corrections shall be given commutation from their sentences for having served time at the West Virginia Penitentiary for Men at Moundsville. Such commutation of sentence shall be called 'credit on sentence'. The 'credit on sentence' shall be deducted from the minimum term of indeterminate sentences or from the fixed term of determinate sentences. Each inmate who serves time, or who served time, actually incarcerated at the West Virginia Penitentiary for Men at Moundsville after July

<hr />

1. Mr. Bordenkircher is no longer the Penitentiary warden and the other originally named appellant, Joseph McCoy, is no longer the Commissioner of the Department of Corrections. *See* note 3, *infra*.

2. As the circuit court notes in its order of September 2, 1993, "[s]pecific grievances concerning confinement were, and are, addressed under *Crain* on a case by case basis in the Circuit Court of Marshall County by the undersigned judge [Honorable John Madden]."

1, 1992, shall receive one day of credit on sentence for each day he is incarcerated. No inmate sentenced to a life sentence shall receive credit on sentence under this order. However, inmates serving life sentences with mercy and recidivists serving life sentences, are given a 'credit on sentence' against the minimum sentence that they must serve to be eligible for consideration for parole. An inmate under two or more consecutive sentences shall be allowed credit on sentence as if the several sentences, when the maximum terms thereof are added together, were all one sentence.

The circuit court expressly stayed the effective date of the order for sixty days to permit the filing of this appeal.

### I.

The only issue before the Court is whether the September 2, 1993, order improperly granted certain Penitentiary inmates a "credit on sentence." The Appellants contend that the order is contrary to this Court's prior decisions and frustrates the efforts of the Division of Corrections in its continued efforts to comply with this Court's scheduled mandates. Further, the Appellants maintain that this Court has previously considered the possibility of early release of prisoners from the Penitentiary and determined such release to be inappropriate. In contrast, the Appellees argue that the ordered time cuts properly fell within the scope of the lower court's inherent equitable powers to fashion whatever remedy necessary to uphold the strictures of the Eighth Amendment to the United States Constitution and Article III, Section 5 of the West Virginia Constitution. In addition, the Appellees contend that the remedy ordered by the trial court in no way conflicts with the law established by this Court in

prior related proceedings and that compelling institutional and public policy considerations warrant an affirmance of the circuit court's order.

\*　　\*　　\*　　\*　　\*　　\*

■ Since 1988 we have repeatedly set forth the following holding as the basis for each *Crain* decision: "This Court has a duty to take such actions as are necessary to protect and guard the Constitution of the United States and the Constitution of the State of West Virginia." Syl.Pt. 2, *Crain v. Bordenkircher*, 180 W.Va. 246, 376 S.E.2d 140 (1988) (*Crain III* ).[3] To fully appreciate the nature and extent of this Court's ongoing effort to monitor the situation at the Penitentiary in conjunction with the construction of the Mount Olive Correctional Complex ("MOCC") and the role we have undertaken in these proceedings, we review the history of *Crain.*

The first *Crain* proceeding originated in 1981 when Penitentiary prisoners sought a writ of prohibition, alleging that the conditions of their confinement constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Article III, Section 5 of the West Virginia Constitution. This Court appointed the Honorable Arthur M. Recht to conduct a hearing on the issues raised by the Petitioners. Following a hearing, Judge Recht issued a Final Order which concluded that the conditions at the Penitentiary constituted cruel and unusual punishment. Judge Recht made certain recommendations to bring the Penitentiary conditions within constitutional standards and ordered the Department of Corrections to devise a compliance plan targeted at achieving constitutional standards.

*Crain I* began when the inmates appealed the successor special judge's[4] approval of the

**3.** As we noted in *Crain X,*
　　[t]he parties have agreed to continue styling the respondents in this case as Donald E. Bordenkircher, Warden, who was in charge of the Moundsville Penitentiary, and Joseph McCoy, who was the Commissioner of the Department of Corrections, when the original litigation arose in the Circuit Court of Marshall County in 1981. Likewise, Robert Carl Crain, one of the inmates in the penitentiary, is retained as the petitioner in the style.

189 W.Va. 588, 589, 433 S.E.2d 526, 527, n. 1 (1993). Because each of the cases are styled similarly, *Crain v. Bordenkircher,* we do not restate the style of each case in the body of this opinion.

**4.** Following Judge Recht's resignation from the bench, we appointed Judge John F. Bronson to handle this matter.

Department of Corrections' compliance plan. The sole issue before us in that case was whether the compliance plan met the detailed provisions set forth in the Final Order prepared by Judge Recht. Finding that the compliance plan did not completely comport with Judge Recht's order, we directed that a revised compliance plan be submitted by the Department of Corrections within 120 days. 176 W.Va. 338, 365, 342 S.E.2d 422, 450 (1986). Rather than assigning the continuing duties of reviewing the revised compliance plan and furnishing this Court with reports and recommendations to a circuit judge, we deemed it necessary to appoint a special master to assume these duties.[5]

*Crain II* was instituted to resolve the issue of who was required to compensate the special master. We concluded in that case that the Department of Corrections, as the "party whose conduct necessitated the reference to the special master or monitor," was required to bear such expenses. Syllabus, 178 W.Va. 96, 357 S.E.2d 778 (1987).

The subject of *Crain III* was the declaration by the Department of Corrections that it could not comply with the revised compliance plan[6] due to lack of funding. *Crain v. Bordenkircher*, 180 W.Va. 246, 247, 376 S.E.2d 140, 141 (1988). Noting that "the conditions have not improved, nor has the situation become any less unconstitutional since we last directed the Department of Corrections to remedy the problems[,]" we "order[ed] that the State Penitentiary at Moundsville be closed by July 1, 1992." *Id.* at 247–48, 376 S.E.2d at 141–42. Under the Court's authority to enforce the Constitution, we issued a rule to show cause against various state officers as to why this Court should not place the Penitentiary in receivership, grant the receiver power to construct a new facility, and issue a writ of mandamus requiring the State Building Commission to provide for the financing of the construction of the new facility. *Id.* at 250, 376 S.E.2d at 144.

*Crain IV* again recognized the numerous delays in constructing a new facility and expressly directed the Department of Corrections to submit to the special master a plan containing specific proposals for the construction of a new penitentiary by November 14, 1989.[7] 181 W.Va. 231, 234, 382 S.E.2d 68, 71 (1989).

*Crain V* involved the appearance of the parties before this Court on April 3, 1990, for the purpose of providing a status report on the progress made towards implementing the plan for replacing the Penitentiary. 182 W.Va. 787, 789, 392 S.E.2d 227, 229 (1990). At the hearing, we indicated that "the State is progressing as it should to comply with the mandates of this Court." *Id.* at 790, 392 S.E.2d at 230. We also directed that the Directors of the Department of Safety and the West Virginia Regional Jail and Correctional Facility Authority be made parties to the case. *Id.*

*Crain VI* was yet another opportunity for this Court to be provided a status report concerning the prison construction project. We observed that the process of reviewing these status reports is a "continu[ation] [of] our on going [sic] general supervision of the project as a result of our obligation to remedy the constitutional deficiencies that we found in the penitentiary in our original *Crain* decision. . . ." 185 W.Va. 603, 605, 408 S.E.2d 355, 357 (1991). We adopted the special master's recommendations that this Court approve the architectural plans, subject to modifications for budgetary purposes, and we agreed with his recommendation that any future modifications of the architectural plans be submitted to the special master for approval prior to implementation. *Id.*

A status report on February 4, 1992, resulted in *Crain VII*. The Court was apprised at this time that certain preliminary

---

**5.** "By having the Special Master report directly to this Court, it is hoped that this matter may move more expeditiously than requiring it to be handled by a circuit judge." 176 W.Va. at 363, 342 S.E.2d at 448.

**6.** The revised compliance plan was submitted in September 1986.

**7.** That plan was approved by the special master and submitted before this Court on January 9, 1990. We accepted the plan and scheduled a hearing on April 3, 1990, "recognizing a need for continued review of its implementation." 182 W.Va. 787, 789, 392 S.E.2d 227, 229.

site preparation and construction work on the new prison had been completed, but that bids received for the next construction phase were over budget by approximately $7,000,-000. No. 16646, slip. op. at 2 (W. Va. filed February 27, 1992) (per curiam order). After hearing that the Appellants were considering several options for dealing with the over-budget bids, we concluded that the Appellants were taking all reasonable steps to comply with our orders and continued the matter until May 5, 1992.[8] *Id.*

On June 2, 1992, the parties appeared before this Court to present a status report and the Appellants requested that the Penitentiary's closure date scheduled for July 1, 1992, be extended for an additional twenty-seven months. 187 W.Va. 596, 420 S.E.2d 732 (1992) (*"Crain VIII"*). Based on the anticipated construction period, we concluded that an additional delay of closure for twenty-four months was justified and, accordingly, stayed the closure order for an additional two years. *Id.* at 598, 420 S.E.2d at 734.

The next three *Crain* decisions concerned status reports on the operational procedures plan and the proposed budget for funding the MOCC facility. In *Crain IX,* we directed the Appellants to submit a completed operational procedures plan for MOCC to the special master and continued the matter until May 4, 1993. 188 W.Va. 406, 408, 424 S.E.2d 751, 753 (1992). *Crain X* resulted from a hearing on June 1, 1993, wherein the parties reported that while an agreement dealing with most of the major administrative policy issues included in the operational procedures had been reached, the final plan was still incomplete due to disagreement over various policies.[9] 189 W.Va. 588, 433 S.E.2d 526 (1993). "In conformity with our continuing supervisory

role," we ordered the parties to submit their completed operational procedures plan to the special master by November 15, 1993 for arbitration. *Id.* at 590, 433 S.E.2d at 528. We further directed the Appellants to advise the special master regarding the transition plan to the new facility. *Id.* In *Crain XI,* the parties submitted a joint status report to the Court on February 25, 1994, indicating that the parties were in agreement on all the operational procedures at the MOCC with the exception of the monitoring of the inmates' telephone calls and the proposal that the inmates' outgoing mail carry the MOCC name. 191 W.Va. 343, 345, 445 S.E.2d 730, 732 (1994). We agreed with the special master's recommendations that both of these proposals by the Appellants were reasonable correctional policies and scheduled the matter for further hearing on June 28, 1994.[10] *Id.*

At issue in *Crain XII,* the most recent *Crain* decision,[11] was the Appellants' request that we modify our June 25, 1992, decision requiring the closure of the WVP by July 1, 1994. 191 W.Va. 583, 447 S.E.2d 275 (1994). Responding to the request for a four-month extension to the closure of the Penitentiary, we stated:

with reluctance, we allow an additional four months to close the WVP and transfer inmates to the MOCC, which means that the period for completion of the facility will end on October 31, 1994. This matter will be set for a further hearing before this Court on Tuesday, November 1, 1994. At that hearing, we expect a report that all matters relevant to the transfer to the MOCC are completed and that the administrative rules are finished. Should any condition arise which would prevent the transfer to the new facility by October 31,

---

8. By order of this Court, the case was continued until June 2, 1992.

9. Some of the issues in dispute included: "(1) monitoring telephone calls; (2) identifying outgoing correspondence as being from a prison; (3) composition of the administrative segregation committee; (4) the nature and future use of administrative segregation; and (5) the need for a full-time dietician." *189 W.Va. at 590, 433 S.E.2d at 528.*

10. We stated further that we expected the parties to report at the June 28, 1994, hearing "that all matters are completed" and noted that "[t]he report also should include the completion date for the MOCC." 191 W.Va. at 346, 445 S.E.2d at 733 and n. 10.

11. In actuality, yet another *Crain* decision was necessitated. In *Crain XIII,* this Court on November 29, 1994, again sought a progress report on the construction of the MOCC facility. *See* 192 W.Va. 416, 452 S.E.2d 732 (1994).

1994, or the failure to finish the administrative rules, the parties immediately should report the same to this Court. It is possible that the failure to comply with the mandates of this opinion may result in a rule to show cause for contempt.

*Id.* at 585–86, 447 S.E.2d at 277–78.

## II.

We now address whether the circuit court improperly granted certain inmates at the Penitentiary a "credit on sentence." At the crux of this issue is the question of whether the circuit court had the authority to grant Penitentiary inmates a reduction in sentence.[12]

As grounds for its decision to issue the sentence credits, the trial court relied on this Court's holding in syllabus point two of *Crain III* which recognized that the West Virginia Supreme Court of Appeals "has a duty to take such actions as are necessary to protect and guard the Constitution of the United States and the Constitution of the State of West Virginia." 180 W.Va. at 246, 376 S.E.2d at 140. Based on a "literal interpretation" of this holding, the circuit court concluded that it was required to issue sentencing credits from the original date scheduled for the Penitentiary's closure.

As further support for its position, the circuit court relies on *Harrah v. Leverette,* 165 W.Va. 665, 271 S.E.2d 322 (1980), a case in which inmates at the Huttonsville Correctional Center ("HCC") sought unconditional release from confinement, alleging that they had been deprived of their federal and state constitutional rights to due process of law and freedom from cruel and unusual punishment following a riot at the prison. After determining that the inmates' rights had been violated,[13] we examined what remedy would be appropriate under the facts of that

specific case. *Id.* at 679, 271 S.E.2d at 331. We initially dismissed the concept of an unconditional release of the affected inmates, noting that "[a]n exhaustive search of habeas corpus cases involving cruel and unusual punishment of prisoners failed to discover any case wherein an abused prisoner was unconditionally released." *Id.* at 680, 271 S.E.2d at 331.

We then ordered the Department of Corrections to

provide us a plan, tailored to each aggrieved individual's present status and the effronteries which he suffered as testified to in his deposition or proved by other evidence, which reduces the degree of restraint to which each such individual is presently subject. Such reductions in length and conditions of confinement might include, in appropriate cases, release from parole restrictions for persons already paroled; release on parole or on conditions comparable to parole for persons still incarcerated; *reduction in length of sentences* and transfer to less restrictive facilities or programs.[14]

*Id.* at 683, 271 S.E.2d at 332–33. (emphasis added, footnote omitted, and footnote added). We noted that

We do not, except with great reluctance, discharge prisoners whose constitutional right deprivations do not go to their guilt or innocence of the underlying charges for which they were incarcerated. But we will not subject persons to cruel and unusual punishment. Those activities must be permanently corrected or else the government may be enjoined from putting any convicted criminals in jail or prison.

*Id.* at 684, 271 S.E.2d at 333. Finally, we made it clear that we would review the plans "and if they are acceptable make such fur-

---

12. The Appellants argue that the circuit court's order violates West Virginia Code § 28–5–27(k) (1992) which provides that there shall be no grants or accumulation of credit to any sentences of inmates, except as provided for in said statutory provision.

13. We concluded that the inmates' due process rights were violated based on the way they were charged and brought before the disciplinary counsel. 165 W.Va. at 673, 271 S.E.2d at 328.

We also found that the inmates had been subjected to cruel and unusual punishment because of the continuous abuse and physical force exerted on inmates after the riot ceased. *Id.* at 679, 271 S.E.2d at 330.

14. Only seventeen inmates were the subject of the remedy to be fashioned in *Harrah. See* 165 W.Va. at 688, 271 S.E.2d at 335, app. B.

ther orders as may be appropriate to effectuate them." *Id.* at 683, 271 S.E.2d at 333.

While *Harrah* indicated that sentence reduction might be a remedy for cases in which cruel and unusual punishment conditions are found, the *consideration* of utilizing such remedy was expressly limited to those cases determined by this *Court* to be appropriate. The suggested reduction in the length of sentences for certain inmates in *Harrah* was never intended as a remedy to be methodically utilized in cases involving cruel and unusual punishment, without case by case consideration. Neither did we intend our comment regarding sentence reduction to be construed as a remedy available on a broad scale basis to the circuit courts of this state. An examination of *Harrah* reveals that the ultimate decision regarding any remedy, including the possibility of sentence reduction, was specifically retained by this Court. *See* 165 W.Va. at 683, 271 S.E.2d at 333.

The circuit court also relied on language, included in *Crain III*, which noted, "[w]e feel compelled to point out that the release sought by the petitioners may be the only remaining alternative to this Court after July 1, 1992, if the conditions of confinement are not remedied." 180 W.Va. at 248, 376 S.E.2d at 142. Although we referenced such a drastic remedy, despite numerous opportunities to do so (*Crain IV to XII*), we have never opted to impose such a severe solution, preferring instead to direct the completion of the MOCC's construction on as timely a basis as we had the ability to effect. Moreover, our response to the Petitioners' request in *Crain III* for unconditional release was made in the context that such action *may* become necessary if the legislative and executive branches failed to take action resulting in the construction of a new penal facility which would comply with constitutional standards. As is clear from the *Crain* history set forth in section I. of this opinion, the necessary actions were undertaken, upon our continual prodding, which enabled the financing of and completion of the MOCC.[15]

What is evident from the history of the *Crain* case, as set forth above, is that this Court has always maintained supervisory control and responsibility for overseeing the remedy necessary to alleviate the cruel and unusual conditions at the Penitentiary.[16] As is demonstrated by the history of the *Crain* case, we have continuously required the parties to apprise this Court as to the progress of the prison completion. Furthermore, we have served as the overseer, responsible for resolving numerous issues which arose during the course of the MOCC's construction. Notwithstanding the appointment of both special judges and a monitor to resolve seemingly unending issues related to such construction, we have never relinquished the ultimate and ongoing responsibility of seeing that the MOCC facility was constructed pursuant to constitutional requirements.

The remedy which this Court fashioned to correct the Penitentiary conditions which resulted in cruel and unusual punishment for the inmates was to close the prison following the construction of a new facility. While we are not unmindful that delays in the construction of the MOCC resulted twice in decisions by this Court to modify the closing date of the Penitentiary, both delays were found by this Court to be justified. Even the last modification of the closing date of the Penitentiary to November 1, 1994, which we reluctantly granted in *Crain XII*, did not cause us to reconsider our original remedy. 191 W.Va. at 585, 447 S.E.2d at 277.

Inherent in this Court's duty to take such actions as are necessary to protect and guard the Constitution of the United States and the Constitution of the State of West Virginia is the related duty to supervise all necessary actions through completion and the concomitant responsibility to revise and/or modify directives issued by lower courts pertaining to such actions. Since this Court retains the ultimate authority to effectuate the remedy which we created, we con-

---

**15.** The MOCC was dedicated and opened on December 12, 1994.

**16.** We note, as in *Crain I,* that the actual finding of the existence of cruel and unusual punishment arising from the conditions at the Penitentiary was never appealed to this Court. 176 W.Va. at 364, 342 S.E.2d at 449.

clude that the trial court improvidently granted a "credit on sentence" to certain inmates. As is clear from this Court's language in *Harrah,* it remains the duty of this Court to approve any remedies arising from a finding of cruel and unusual punishment. *See* 165 W.Va. at 683, 271 S.E.2d at 333. If the circuit court concluded that a sentence credit was warranted based on the finding of cruel and unusual punishment plus the delay in opening the MOCC facility, the wiser course of action, consistent with *Harrah,* would have been to submit such a plan for approval first to this Court prior to entering an order directing the same. It remains the duty of this Court to fashion the appropriate remedy arising from the *Crain* case.

Based on the foregoing, the decision of Circuit Court of Marshall County is hereby reversed and remanded for the entry of an order consistent with this opinion.

Reversed and remanded.

BROTHERTON, C.J., did not participate.

MILLER, Retired J., sitting by temporary assignment.