708 A.2d 288

Michael Timothy KNOTT

v.

STATE of Maryland.

No. 62, Sept. Term, 1997.

Court of Appeals of Maryland.

April 14, 1998.

Julie Anna Saslow (Anthony Bornstein, on brief), Washington, DC, for petitioner.

Regina Hollins Lewis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for respondent.

Argued before ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., DALE R. CATHELL, Judge (Specially Assigned), and MARVIN H. SMITH, Judge (retired), Specially Assigned.

RODOWSKY, Judge.

The petitioner, Michael Timothy Knott (Knott), was tried before a jury in the Circuit Court for Charles County on charges of (1) assault with intent to kill, (2) assault with intent to maim, disfigure, or disable, (3) reckless endangerment, (4) assault and battery, and (5) malicious destruction of property. The jury found Knott guilty on the third, fourth, and fifth charges. Knott, submitting that he had been compelled to stand trial in identifiable prison garb, appealed to the Court of Special Appeals. That court, in an unreported opinion, held that Knott had failed to preserve his contention and that the error in any event was harmless beyond a reasonable doubt. We granted Knott's petition for certiorari, and, for the reasons stated below, we shall reverse.

At the time of the events giving rise to the charges against Knott, the victim, Cornell Tirrell Posey (Posey), was living in his mother's house in Waldorf with Erika Denise Carroll (Carroll). Carroll also had been having a sexual relationship with Knott over the preceding year.

On the morning of November 13, 1994, Carroll informed Posey that she was leaving to attend a basketball game. Shortly thereafter, Posey, while driving to a friend's house, observed Carroll driving her vehicle with Knott following her in another vehicle. The three persons parked their vehicles by the side of the road, and a conversation ensued. Posey testified that, after Carroll drove away, Knott retrieved a

hunting knife from his car and threatened to stab Posey, but he, Posey, drove away. Knott testified that after Carroll had pulled away, Posey questioned Knott about his relationship with Carroll, that neither man produced a knife, and that the two parted company without incident.

Later that evening Knott and Carroll rented a room at the Waldorf Motel where they had sex and fell asleep. Posey testified that when he arrived home at approximately 10:00 that evening he discovered that Carroll was not home. According to Posey's testimony, he had consumed a six-pack of beer and a pint of brandy at a friend's house, but was not drunk. Posey went to Carroll's sister's house to inquire about Carroll's whereabouts and was told that Knott had forced Carroll to go with him. Posey then went to the apartment complex where two of Knott's aunts resided, but was unable to find Knott or Carroll. Posey did, however, observe Carroll's vehicle parked outside the apartment complex. Knowing that Knott and Carroll had on at least one occasion patronized the Waldorf Motel, Posey decided to go to the motel in search of Carroll.

Upon arriving at the motel at approximately 12:00 a.m. on November 14, 1994, Posey observed Knott's vehicle parked in front of two of the motel's rooms. Posey testified that he parked next to Knott's vehicle and blew his horn for approximately ten minutes, and, after receiving no response, knocked on the door to one of the two rooms. One of the occupants of the room, Joseph Dean Jordan III (Jordan), testified that when he answered the door, Posey asked him whether Carroll was in the room, to which Jordan responded that she was not. Posey entered the room, looked around briefly, and left. Posey then knocked on the door of the room next to Jordan's. Knott opened the door. Posey and Knott provide very different accounts of what happened next.

According to Posey, he entered the room and observed Carroll lying on the bed. Posey walked over to Carroll, punched her in the back, and told her to get up so that he could speak with her. Carroll, who appeared to be in a

drugged state, fell to the floor, got up, and went into the bathroom, closing the door behind her. Ignoring Knott's requests that Posey leave, the latter began beating on the bathroom door. At that time Knott approached Posey, who was unarmed, with the same hunting knife with which he had threatened Posey earlier that day. After threatening to kill Posey if he did not leave, Knott stabbed Posey in the leg. Posey left the room but refused to leave the motel parking lot until he had an opportunity to speak with Carroll. Knott then began swinging the knife at Posey, who attempted to ward off the attack with his fists. Posey testified that after being stabbed in the arm and chest, he tripped and fell to the ground, at which time Knott stabbed him in the back and buttocks. Posey got up and entered the driver's side of his car. Knott approached the vehicle and smashed the driver's side window with his fist. Knott went back into the motel room and emerged with Carroll approximately ten minutes later. Carroll and Knott got in Knott's car and pulled away. Posey went to the home of his godfather, who promptly called 911. Posey had been stabbed a total of nine times—in his arm, behind his ear, in the hand, above the heart, in his back, in his side, in his buttocks, and twice in the leg.

According to Knott, Posey forced his way into the motel room after Knott answered the door. Posey then approached Carroll, who was lying in the bed, and struck her in the back with his fists several times. As Carroll attempted to get out of the bed, Posey continued to swing his fists at her. Knott then grabbed Posey by the shoulders and arms while Carroll ran into the bathroom. Knott interposed himself between the bathroom door and Posey. Posey then began swinging at Knott, trying to get to the bathroom. Posey struck Knott in the eye, and Knott responded by striking back at Posey. Posey then pulled out a knife and rushed at the bathroom door. Knott grabbed Posey's hand and pushed him toward the bed. The two men fell on the bed and tumbled to the floor, whereupon Posey lost hold of the knife. Knott retrieved the knife and again stepped in front of the bathroom door. Posey continued to charge at the bathroom door, despite the

fact that Knott was swinging the knife at him. Knott repeatedly succeeded in chasing Posey out of the room only to have Posey reenter the room and charge at him again. Eventually Knott drove Posey out into the motel parking lot. Posey got into his car and pulled in front of Knott's car, blocking him in. In an effort to force Posey to move his car, Knott smashed the driver's side window of Posey's car. Knott then called to Carroll, who came out into the parking lot. Knott testified that he threw the knife at Posey's car and that he and Carroll then drove away. Posey followed, driving alongside Knott's vehicle and screaming at Knott and Carroll, until Posey eventually turned off the road. Knott testified that he suffered a blood clot in the eye and a swollen cheek as a result of the exchange. Knott did not call the police to report the incident.

The police officers who responded to the altercation did not recover a knife in the motel parking lot.

On December 11, 1994, Charles County police officer Ralph Acquaviva (Acquaviva) arrested Knott at a birthday party at Knott's aunt's house. Acquaviva testified that he found Knott hiding in an upstairs bedroom closet. Knott denied concealing himself in the closet, and testified that he was sitting on a bed in the upstairs bedroom, smoking a cigarette when Acquaviva arrested him. Acquaviva testified that, while transporting Knott, Acquaviva told Knott that he would probably be charged with assault with intent to maim. It is Acquaviva's testimony that Knott responded: "I should have just killed the motherfucker." Knott denied making such a statement.

Carroll testified as a witness for the defense. At the time of her testimony, she was living with Posey in her mother's house. Carroll testified that Knott had not forced her to go with him to the Waldorf Motel on the evening of November 13, 1994, that Knott did not have a weapon on him that evening, and that Knott had asked Posey to leave after Posey had struck Carroll in the back with his fists. Carroll further testified that Knott, whom she observed as having bruises

around his face but no stab wounds, admitted to her that he stabbed Posey. Knott admitted telling Carroll as much.

Knott was tried on May 15 and 16, 1995. He had been incarcerated at the Charles County Detention Center since his arrest. Knott arrived at the courthouse on the first day of trial wearing the jail uniform.[1] Immediately after the case was called, the following colloquy took place:

"[DEFENSE COUNSEL]: ... Your Honor, this matter is scheduled for a trial today. Mr. Knott indicates that he would like me to ask the Court to grant a continuance. One of the reasons is that Mr. Knott indicated when I asked him earlier this morning why he is not dressed so the jury has no—

"THE COURT: Hint as to where he is.

"[DEFENSE COUNSEL]: Preconceived notions as to where he is[.] [H]e indicated like I told him earlier when we talked about this case about having civilian clothes and he told me he didn't have anybody to bring him any. That his sister's car broke down yesterday.

. . . .

"THE COURT: ... Mr. Knott I don't understand why it is necessary to continue the case for either of the reasons assigned.[2] If you had civilian clothes available I would

---

1. The record is silent as to the appearance of the jail uniform worn by Knott to trial, with one exception. On direct examination, Posey recounted seeing Knott driving behind Carroll on the morning of November 13. The following then took place:

"[PROSECUTOR]: Can you point out the person you saw and describe what he is wearing for the ladies and gentlemen?
"[POSEY]: He is wearing an orange jumper.
"[PROSECUTOR]: May the record indicate the identification of the defendant in this matter.
"THE COURT: It will."

There is no indication in the record as to whether the orange jumpsuit bore any markings identifying it as issued by the Charles County Detention Center.

2. Knott sought to continue the case on two grounds: first, to give him an opportunity to procure and to don civilian clothing; and second,

certainly make arrangements for you to wear them. I would think that arrangements could still be made for you to wear them if absolutely necessary.

"On the other hand I don't understand why there is any particular reason to think that the jury would be disaffected by knowing that you were in custody given the nature of the charges here. I don't think it would be of any surprise to the jury to discover that someone charged with offenses like this would be in jail in lieu of bond. I don't think that is a big deal at all. It happens everyday.

"Anything you care to say about that, sir?

"THE DEFENDANT: No, sir.

. . . .

"THE COURT: Okay. The request for the continuance is denied."

On the first day of trial Knott testified before the jury while garbed in his orange, prison-issued jumpsuit. The record is silent as to his attire on the second day of trial when the jury found him guilty on three counts. The circuit court sentenced Knott to ten years for assault and battery, and to lesser, concurrent sentences for reckless endangerment and malicious destruction of property.

On his appeal to the Court of Special Appeals, Knott argued that the trial court had impermissibly compelled him to wear prison clothing at his jury trial. Citing *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), the intermediate appellate court ruled that the trial court had reached an "erroneous conclusion" in failing to grant Knott's motion for a continuance, and that "the court could have and should have undertaken some effort to permit the appellant to sit before the jury in clothing that did not give the aura of 'prisoner.'" Nevertheless, the Court of Special Appeals affirmed the judgment of conviction. The error was held not to be reversible error for two reasons.

_____

because Knott was of the opinion that defense counsel was not sufficiently prepared for trial.

"First, this alleged error by the trial judge is not properly before us because appellant did not preserve it by objecting to the denial. Counsel's mere mention in passing that appellant should be dressed in civilian clothes is not enough to preserve this issue for appeal. Second, the error, if any, was harmless, for the evidence of appellant's guilt that appears in this record is so overwhelming that we cannot imagine circumstances under which this jury could have found him 'not guilty.' "

Thereafter, this Court granted Knott's petition for certiorari.

In this Court Knott argues that, under *Estelle,* all that was required of him for preservation purposes was that he make a request to be tried in civilian clothing, which he clearly did. He also argues that the error was not harmless beyond a reasonable doubt.

The State concedes that Knott made an initial objection to being tried in prison attire, but asserts that Knott thereafter abandoned this objection by failing to respond when the court, after having given its opinion of Knott's objection, asked Knott if he had anything more he cared to say on the issue. Recycling the same facts, the State argues that Knott waived his objection and eliminated the possibility of compulsion when he failed to respond after the court stated that arrangements could still be made to obtain civilian clothing. Further, the State contends that the record fails to reflect that the jumpsuit was identifiable as prison garb. Finally, noting that the jury acquitted Knott of the two most serious charges against him and reviewing the strength of the evidence against him, the State also submits that any error was harmless because it could have had no impact upon the jury's verdict.

I

We agree with that aspect of the opinion of the Court of Special Appeals stating that the trial court "should have undertaken some effort to permit the appellant to sit before the jury in clothing that did not give the aura of 'prisoner.' "

The trial court erred in concluding that there was no prejudice to Knott based on the premise that jurors would know from the seriousness of the charges that Knott had been confined.

There may well have been no error if the trial judge had inquired where Knott had other clothes available and how much time would be required to get those clothes to the courthouse. A fully developed inquiry along the above lines may have supported a finding that Knott waived his right to appear in non-prison garb, for example, by appearing in court in prison garb as a tactic in an attempt to force a postponement of the case to another day.

## II

In *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), a defendant charged with assault with intent to commit murder with malice asked a jail officer on the morning of trial for his civilian clothing to wear at trial. *Id.* at 502, 96 S.Ct. at 1692, 48 L.Ed.2d at 129. The request was denied, and the defendant was tried dressed in identifiable prison clothing. *Id.* At no time prior to or during the jury trial did the defendant raise the issue with the trial judge. *Id.* at 502, 96 S.Ct. at 1692, 48 L.Ed.2d at 129–30. The jury found the defendant guilty. *Id.* at 503, 96 S.Ct. at 1692, 48 L.Ed.2d at 130. Federal habeas corpus relief was denied by the district court, but the court of appeals reversed. *Id.* The Supreme Court thereafter reversed the court of appeals. *Id.* at 513, 96 S.Ct. at 1697, 48 L.Ed.2d at 135.

 Noting that, "[t]he right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment," the Supreme Court concluded that "[t]he presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Id.* at 503, 96 S.Ct. at 1692, 48 L.Ed.2d at 130. Compelling a defendant to stand trial in identifiable prison attire impairs that presumption because it serves as a "constant reminder" that the accused is in custody, and presents an unacceptable risk that the jury will consider that fact in rendering its

verdict. *Id.* at 504–05, 96 S.Ct. at 1693, 48 L.Ed.2d at 130–31. In addition to running afoul of the fair trial requirement of the Fourteenth Amendment, compelling a defendant to stand trial in prison attire is "repugnant to the concept of equal justice embodied in the Fourteenth Amendment," in that usually only those who cannot afford to post bail prior to trial are so compelled. *Id.* at 505–06, 96 S.Ct. at 1694, 48 L.Ed.2d at 131.

▮▮▮ The presumption of innocence, however, is not impermissibly impaired every time a defendant stands trial before a jury in prison attire. Essential to a finding of a constitutional violation is the element of compulsion. That is, "the particular evil proscribed is compelling a defendant, against his will, to be tried in jail attire." *Id.* at 507, 96 S.Ct. at 1694–95, 48 L.Ed.2d at 133. The Court in *Estelle* explained that the reason for the compulsion requirement is to prevent defendants from choosing to appear at trial in prison attire for tactical reasons, and then later claiming that such an appearance constituted reversible error:

> "The reason for this judicial focus upon compulsion is simple; instances frequently arise where a defendant prefers to stand trial before his peers in prison garments. The cases show, for example, that it is not an uncommon defense tactic to produce the defendant in jail clothes in the hope of eliciting sympathy from the jury."

*Id.* at 507–08, 96 S.Ct. at 1695, 48 L.Ed.2d at 133; *see also Garcia v. Beto,* 452 F.2d 655 (5th Cir.1971) (defendant waived his right to be tried in civilian clothes where defense counsel testified at state habeas corpus proceeding that it was part of his trial strategy to allow the defendant to appear before the jury in prison attire). In order to establish compulsion, a defendant must object to being tried in prison attire. "[T]he failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." *Estelle,* 425 U.S. at 512–13, 96 S.Ct. at 1697, 48 L.Ed.2d at 135.

The United States Court of Appeals for the Seventh Circuit recently held that a defendant who failed to object to being tried in an unmarked, orange prison jumpsuit after his sister's efforts to procure suitable civilian clothing failed was not compelled to stand trial in prison attire. *See United States v. Arellano*, 137 F.3d 982 (7th Cir. 1998). The defendant in that case made no objection at any time to the fact that he was garbed in prison attire, nor did he give any indication whatsoever that he desired to be tried in civilian clothing.

The instant case is distinguishable from *Estelle* and *Arellano* in that Knott voiced his objection to being tried in prison attire to the trial judge immediately after the case was called but before voir dire, thereby establishing the element of compulsion which was lacking in both *Estelle* and *Arellano*. Knott raised his objection in assigning reasons for the requested continuance, and the trial court decided the issue. *See* Maryland Rule 8–131(a).

A defendant, such as Knott, who objects to being tried in prison attire before the jury has been impaneled is deemed to have objected in a timely manner and not to have waived his right to be tried in civilian clothing. *See, e.g., Fernandez v. United States*, 375 A.2d 484 (D.C.1977) (where defendant objected to being tried in prison attire one hour and ten minutes after court session began but before voir dire, objection was deemed timely); *State v. Brown*, 585 So.2d 1211 (La.1991) (per curiam) (where defendant objects to being tried in prison garb prior to the impaneling of the jury, objection is timely and there is no waiver); *State v. Spellman*, 562 So.2d 455, 456 (La.1990) (per curiam) (if a defendant objects to standing trial in prison attire before the jury has been impaneled, "[a] reasonable delay is appropriate to accommodate a defendant's right to be tried in his own clothes and, moreover, works no hardship on the state"); *State v. Leggett*, 363 So.2d 434, 438 (La.1978) ("When the defense objects before the jury is impaneled and the object[ion] is not simply a dilatory tactic, then the state is not prejudiced by allowing defendant the extra time to change to civilian clothing. The trial court erred

in not allowing the defendant this right."); *see also United States v. Harris*, 703 F.2d 508 (11th Cir.1983) (objection made after the start of voir dire but as soon as defense counsel became aware of fact that defendant was garbed in prison attire was deemed timely).

The Second Circuit's decision in *United States v. Hurtado*, 47 F.3d 577 (2d Cir.), *cert. denied*, 516 U.S. 903, 116 S.Ct. 266, 133 L.Ed.2d 188 (1995), is particularly instructive on the issue of whether Knott objected in such a manner that the denial of that objection constituted compulsion.[3] Following a jury trial, the defendant in *Hurtado* was convicted of conspiracy to distribute and possession with intent to distribute heroin and cocaine. *Id.* at 579. Defendant contended that he was compelled to appear in court the first day of trial dressed in his prison uniform. *Id.* In the week prior to trial, the defendant's family made several attempts to get civilian clothes to the defendant, but were not permitted to do so. *Id.* at 581. The family did not bring civilian clothes with them to court on the first day of trial. *Id.* Defense counsel, who did not expect the defendant to arrive for trial clad in his prison uniform, objected as soon as he became aware of the defendant's appearance. *Id.* The court denied counsel's request for a

---

**3.** For additional cases addressing the issue of what constitutes compulsion, see *United States v. Henry*, 47 F.3d 17, 22 (2d Cir.) (defendant was not compelled to stand trial in prison attire where "court did not affirmatively prevent [him] from wearing civilian clothing, but simply refused to excuse [his] failure to make proper arrangements despite receiving ample notice and opportunity"), *cert. denied*, 515 U.S. 1110, 115 S.Ct. 2263, 132 L.Ed.2d 268 (1995); *Tarpley v. Dugger*, 841 F.2d 359 (11th Cir.) (no compulsion where court afforded defendant time to procure civilian clothing, as well as recommendations of certain local agencies that might provide indigent defendant with such clothing), *cert. denied*, 488 U.S. 837, 109 S.Ct. 101, 102 L.Ed.2d 76 (1988); *State v. Wright*, 632 S.W.2d 296 (Mo.Ct.App.1982) (defendant was not compelled to stand trial in prison attire where he had been given ten days' notice of his trial date and had failed to procure civilian clothing); *Commonwealth v. Neal*, 387 Pa.Super. 165, 170–71, 563 A.2d 1236, 1239 (1989) ("[A] defendant who has had ample opportunity to obtain civilian clothing prior to trial, and who has refused to wear such clothing offered to him, may not complain post-trial that he was compelled to stand trial in prison garb."), *appeal denied*, 525 Pa. 597, 575 A.2d 564 (1990).

recess to allow the defendant's family to purchase civilian clothing, stating that the problem could have been resolved prior to trial and there was no reason to delay the proceedings. *Id.* On appeal, the *Hurtado* court summarized the arguments of the parties as follows:

> "[The defendant] claims that he was compelled because he timely objected and because his family made several efforts prior to trial to deliver his street clothes to prison. The government contends that [the defendant] was not compelled because there was no policy at the prison to prevent the delivery of clothes, because [the defendant] did not raise the issue with the district court prior to trial, and because no family member brought clothes to court, even though they were allegedly aware of the problem."

*Id.*

Noting that defense counsel objected as soon as he became aware of the defendant's appearance and that the defendant had not chosen to appear at trial in prison attire for tactical reasons, the court concluded that the defendant "should have been afforded a reasonable opportunity to procure street clothes in light of the potential prejudicial impact of his appearance in prison clothes." *Id.* Failure to provide such an opportunity, the court held, resulted in the defendant's being impermissibly compelled to wear prison clothing the first day of trial in violation of *Estelle.* *Id.*

Stating that *Estelle* violations are subject to harmless-error analysis, the court went on to hold that the defendant's being compelled to stand trial in prison garb was harmless beyond a reasonable doubt. *Id.* at 581–82. To support this conclusion, the court, *inter alia,* pointed to the fact that the evidence adduced at trial, including certain admissions by the defendant, overwhelmingly demonstrated the defendant's guilt. *Id.* at 582.

The instant case and *Hurtado* are similar insofar as Knott did not choose to appear before the jury in prison attire for tactical reasons, and he objected to being tried in prison clothing at the first available opportunity. The cases are

dissimilar, however, with regard to the harmless-error issue, as we explain in Part IV, *infra.*

Nor can Knott be said to have waived his right when, in response to the court's question directed to him after the court had explained its analysis, Knott did not add further facts or argument to his counsel's submission. Knott's point had been made and preserved. We will not adopt a rule that would justify, on the ground of avoiding waiver, having counsel or litigants continue to argue with the court after it has expressed its rationale.

## III

■ The State also advances an argument that the record fails to show that the orange jumpsuit that Knott was wearing was identifiable as prison attire. We do not agree. When Knott's counsel presented her first reason for a continuance, the trial court immediately recognized where the argument was headed and described the attire as giving the jury a "hint" that Knott was being held in jail. Moreover, the trial judge's ground for denying the opportunity to change into mufti was that the jurors would expect Knott to be in jail because of the severity of the charges and, hence, appearing in prison garb would not be prejudicial. Implicit in that analysis is that jurors could recognize Knott's garb as that of a prisoner.[4]

---

4. For cases addressing the precise issue of whether an orange jumpsuit is identifiable prison attire, see *Young v. State,* 283 Ark. 435, 436, 678 S.W.2d 329, 330 (1984) (bright orange jumpsuit with a target on the back and the word "jail" written across the target was "unquestionably distinctive"); *Washington v. State,* 6 Ark.App. 23, 24, 637 S.W.2d 614, 615 (1982) ("It is not clear from the record whether the orange jumpsuit was distinctive as prison clothing."); *People v. Green,* 759 P.2d 814, 815 (Colo.Ct.App.1988) (there was no indication that defendant's orange jumpsuit was a jail uniform); *State v. Brown,* 368 So.2d 961, 964 (La.1979) (on rehearing) (orange-yellow jumpsuit is "distinctive prison garb"); *State v. Wright,* 632 S.W.2d 296, 298 (Mo.Ct.App.1982) (where defendant wore bright orange jumpsuit, there was "no indication in the record of any further markings that would identify the clothes as prison garb and therefore identify appellant as a prisoner"); *State v. Martin,* 624 S.W.2d 879, 881 (Mo.Ct.App.1981) (where there was no indication in the record that orange jumpsuit was "marked in

## IV

 Knott's case was largely a credibility battle. In response to the charges against him, Knott testified that Posey was in fact the aggressor and that Knott was merely trying to defend himself and Carroll. Posey, the only other witness to the altercation, testified that it was Knott who was the aggressor. Both the court and counsel made several references to the fact that the jury's verdict would be determined by whose version of events the jury believed. In its closing argument, the State offered the following: "Now, in determining what those facts are you have to determine who you are going to believe in this matter." The closing argument of the defense echoed that sentiment: "The question is who you believe." Under these circumstances the error is not harmless beyond a reasonable doubt, as required by *Dorsey v. State*, 276 Md. 638, 350 A.2d 665 (1976). *See also State v. Anderson*, 603 So.2d 776, 780 (La.Ct.App.1992) (where defendant offered the defense of consent, compelling defendant to stand trial in prison attire was not harmless beyond a reasonable doubt because "any factor which tended to negate his credibility before the jury could have influenced the outcome of the proceeding").

The case before us bears strong similarity to *Wiggins v. State*, 315 Md. 232, 554 A.2d 356 (1989). There the defendant, who was suspected to have AIDS, was escorted into the courtroom on the first day of trial in the presence of the jury by guards wearing latex gloves. *Id.* at 236, 554 A.2d at 357–58. The second day of trial, the defendant was brought into the courtroom before the jury was seated. *Id.* at 237, 554 A.2d at 358. The guards, again wearing latex gloves, stood immediately behind the defendant. *Id.* Defense counsel objected and moved for a mistrial. *Id.* at 237–38, 554 A.2d at 358. The trial judge ruled: " 'I have no intention of ever removing their gloves, and, therefore, your motion for a mistrial is denied.' " *Id.* at 238, 554 A.2d at 358. We cited

---

any way, with a serial number or initials or an identification number," such clothing was not "clearly recognizable as prison garb").

*Estelle* to the effect that the presumption of innocence is a basic component of a fair trial as guaranteed by the Fourteenth Amendment. *Id.* at 239, 554 A.2d at 359. In holding that the trial court abused its discretion in allowing court personnel to wear the gloves during the jury trial, this Court said:

> "We believe that the jury, viewing the officers guarding Wiggins, would not be without curiosity as to the guards' protective attire. We think that it is not improbable that the jury would assume, in light of the widespread and continuous publicity devoted to AIDS, that Wiggins was infected with the disease. We are of the opinion that the wearing of the gloves, without a sound basis shown for doing so, undermined the fairness of the fact-finding process and diluted the principle that guilt is to be established by probative evidence beyond a reasonable doubt."

*Id.* at 244, 554 A.2d at 361–62.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT REVERSING THE JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY AND REMANDING THIS CASE TO THE CIRCUIT COURT FOR CHARLES COUNTY FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE COUNTY COMMISSIONERS OF CHARLES COUNTY.*