663 S.E.2d 648

**Gary Allen GIBSON, Petitioner Below, Appellee**

v.

**Thomas McBRIDE, Warden, Mount Olive Correctional Facility, Respondent Below, Appellant.**

**No. 33321.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 9, 2008.

Decided June 12, 2008.

Dissenting Opinion of Justice Benjamin June 23, 2008.

Darrell V. McGraw, Jr., Attorney General, Robert D. Goldberg, Assistant Attorney General, Charleston, Counsel for the Appellant.

R. Lee Booten, II Huntington, for the Appellee.

PER CURIAM:

This is an appeal by Thomas McBride, Warden, Mount Olive Correctional Facility ("Appellant"), from an order entered in the Circuit Court of Cabell County, West Virginia, on May 10, 2006. In that order, the circuit court set aside the conviction and sentence of Gary Allen Gibson ("Defendant") for conspiracy to commit murder. Upon careful review of the briefs, record, arguments of counsel, and applicable precedent, this Court is of the opinion that Defendant's constitutional right to a fair trial was violated when the trial court allowed key witnesses for the State, who were incarcerated at the time of trial, to testify in civilian clothing and without shackles while key defense witnesses—who were also incarcerated—testified wearing prison attire and were forced to wear shackles. Accordingly, the order granting Defendant's petition for writ of habeas corpus is affirmed.

I. Factual and Procedural Background

In 1985, Defendant was sentenced to a term of life imprisonment after he was tried and convicted under the recidivist statute.[1] See W.Va.Code § 61–11–18 (2000) (Repl.Vol. 2005). It was during his confinement in the West Virginia Penitentiary, in Moundsville, West Virginia, that the State of West Virgi-

---

**1.** Defendant had been previously convicted of voluntary manslaughter in 1978 and, in 1982, he pled guilty to the offense of burglary. Following his conviction of a separate burglary offense in 1985, he was tried and convicted as a recidivist.

nia ("State") indicted Defendant on the felony charge of conspiracy. The indictment charged that on or about November 26, 1986, Defendant conspired with four other named inmates to commit the murder of Danny Lehman, a fellow prisoner.

During the trial on the conspiracy charge, Defendant's version of the events leading up to and including Danny Lehman's death was presented through the testimony of several fellow inmates. Specifically, Defendant called seven witnesses who were incarcerated at Moundsville at the time of trial. All seven witnesses were shackled and wore prison attire while they testified.[2]

According to the record in this case, over Defendant's objection, the trial court ordered Defendant's incarcerated witnesses to remain "bound and shackled" during their testimony for unspecified "security reasons":

> Prior to the presentation of evidence and testimony by the Defense, the Court ordered that witnesses for the defendant, those who were inmates transported from the Penitentiary at Moundsville, would remain bound and shackled for security reasons, to which ruling the defendant, by counsel, objects and excepts.

Although the foregoing April 17, 1989, order did not also indicate that the trial court had ordered defense witnesses to appear in prison clothing, it is undisputed that all of the defense witnesses who were incarcerated at Moundsville at the time of trial testified wearing prison attire.

At trial, Defendant argued that he was not part of a conspiracy to murder Danny Lehman. Inmate Gary Gillespie testified that he acted alone when he stabbed Lehman in self defense. Gillespie testified that there was a history of trouble between him and Lehman and that, on the day of the murder, the two were involved in a verbal altercation over a piece of exercise equipment in the prison recreation yard.[3] According to Gillespie, Lehman told him he was going to go arm himself and when he returned, Gillespie should be armed, too. Gillespie testified that when Lehman returned,

> I noticed—I can't remember—quite remember if it was the left or his right hand, was hidden out of view behind his leg, and in my mind when I seen that I assumed that he might have had a weapon there out of my sight, but as far as seeing him with a weapon, no, I didn't.

> . . .

> I was just moving along slowly and he was moving at me slowly and it happened so quick. It was more or less a clash. He fell into me and it was just maybe a five or six second thing . . . . we're clutching each other, and I reached down with my left hand and pull out my knife and I strike out.

> . . .

> Well, I had overpowered him with my right arm I had around his neck, and I just brought it around in an arc with my left hand, my knife, and struck and he fell, he collapsed[.]

Gillespie testified that he acted alone in killing Lehman and did not enlist the help of Defendant or any of the other named co-conspirators.[4]

Following Gillespie's testimony, Defendant called six witnesses who were being housed at Moundsville at the time of trial. The purpose of the testimony of five of these witnesses was to directly contradict the State's theory that, as a co-conspirator, Defendant was standing with the other co-

---

2. An eighth witness, John Tompkins, who was housed at Moundsville when the crime occurred, was incarcerated at the Huttonsville Correctional Facility at the time of trial. During his trial testimony, Mr. Tompkins wore civilian attire and was not forced to wear shackles.

3. Danny Lehman was the leader of the Avengers, a motorcycle club comprised of a group of inmates. Lehman recruited other inmates to become members, including Gillespie. Gillespie testified that he was kicked out of the group after he broke one of its rules by having friends outside of the Avengers. Gillespie testified that he then joined an organization known as the Aryan Brotherhood.

4. We note that, during the habeas hearing and in this appeal, Defendant's counsel indicated that, in fact, there was a conspiracy to murder Lehman but that Defendant was not a part of it.

conspirators when and where the murder occurred in order to help facilitate the commission of the murder. Four of these witnesses testified that, after having just come in from recreation, they were talking to Defendant in a different part of the penitentiary when Lehman was murdered.[5] Inmate David Morgan testified that although he was standing near to where the murder occurred, Defendant was not. Morgan also testified that neither he nor any of the other indicted co-conspirators, including Defendant, participated in the murder of Danny Lehman.[6]

 The foregoing witnesses' testimony corroborated Defendant's own testimony that he did not conspire to murder Lehman and did not know Lehman was going to be killed.[7] According to Defendant, he was not present when Lehman was stabbed but was in another location of the prison talking to some other inmates. He testified that when "all of a sudden it got real noisy and there was a lot of movement," he started walking toward the direction of his cell and eventually saw Lehman's dead body lying on the ground.

Contrary to Defendant's version of events, the manner in which Lehman was murdered, who was involved in carrying out the murder, and the identity of the person who committed the murder itself were depicted much differently by the State. Two of the State's key witnesses, Ervil Bogard and Wallace Jackson, were Defendant's fellow inmates at Moundsville when the murder occurred; however, sometime prior to trial, they were transferred to different facilities in exchange for their testimony in this case.[8] The testimony of these witnesses was critical to proving the State's case. Unlike their former prison mates, Bogard and Jackson were permitted to wear civilian clothing at trial. In an order entered on January 4, 1989, the trial court directed the Department of Corrections to furnish these witnesses each with "one noninstitutional shirt and pair of pants for trial."[9] Furthermore, they were not forced to wear shackles during their testimony before the jury.

Inmate Wallace Jackson testified that on the evening of the murder, Defendant, Gillespie and three other inmates stopped outside his cell door. According to Jackson, Gillespie handed him a knife through the door and told him to put it under his pillow. Jackson testified that while Defendant and the other three men were still standing outside Jackson's cell, several of them talked about getting ready to kill Lehman and told the men who had gathered, including Defendant, where to stand. According to Jackson, when

---

5. These witnesses were William Wayne, Tony Kile, Robert Shepherd and Michael Kidwiler.

6. We note that Morgan pled guilty to the conspiracy charge in an "Alford plea." *See Coleman v. Painter*, 215 W.Va. 592, 597 n. 8, 600 S.E.2d 304, 309 n. 8 (2004) ("In an 'Alford plea,' a criminal defendant pleads guilty while proclaiming his innocence.")

7. At trial, Defendant wore civilian clothing and was not shackled. As we held in syllabus point 2 of *State v. Finley*, 219 W.Va. 747, 639 S.E.2d 839 (2006), " '[a] criminal defendant has the right under the Due Process Clause of our State and Federal Constitutions not to be forced to trial in identifiable prison attire.' Syl. Pt. 2, in part, *State ex rel. McMannis v. Mohn*, 163 W.Va. 129, 254 S.E.2d 805 (1979)." Moreover, "[a] criminal defendant has the right, absent some necessity relating to courtroom security or order, to be tried free of physical restraints." Syl. Pt. 3, *State v. Brewster*, 164 W.Va. 173, 261 S.E.2d 77 (1979).

8. Prior to trial, the State filed a Notice of Consideration Given to State Witnesses, which stated that Wallace Jackson agreed to provide truthful

testimony in exchange for transfer to another correctional institution. The notice also indicated that Ervil Bogard agreed to provide truthful testimony in exchange for dismissal by the State of a pending felony charge, and for a motion by the State to expunge Bogard's record of all unlitigated charges arising out of "the January riots" that occurred at Moundsville. The notice also indicated that Bogard's truthful testimony was to be given in exchange for transfer to the Huttonsville Correctional Facility and recommendation by the State that he be granted probation when eligible.

9. The January 4, 1989, pre-trial order also directed the Department of Corrections to transport Bogard and Jackson to the trial location on certain named dates and to provide sufficient personnel to guard against their escape. This order was prepared by the special prosecuting attorney who tried the case on behalf of the State. The record does not indicate if the order was entered pursuant to a formal motion by the State or, if such a motion was made, if Defendant's counsel objected to it.

Defendant and David Morgan were directed to stand outside Jackson's cell door to the left, both men, who were already standing to the left of the door, complied and "stayed on the left-hand side" of the door. Jackson also testified that he saw Defendant carrying a knife.

Finally, Jackson testified that when he saw Lehman come down the tier, Gillespie grabbed him from behind and pulled Lehman towards him. Jackson stated that he saw John Perry and Paul Brumfield stab Lehman. He testified that, meanwhile, he saw Defendant standing less than fifteen feet away.[10]

A second key prosecution witness, inmate Ervil Bogard, testified that the day before the murder, he was approached by all of the inmates who were indicted in the conspiracy to murder Lehman, including Defendant. According to Bogard, several of these men told him they were going to kill Lehman and asked Bogard to be a "cut off" person, to "make sure nobody else from the Avenger's [Lehman's gang] jumped in to help [Lehman] when it came down." Bogard further testified that Defendant and two others, Gillespie and Brumfield, asked Bogard if he was going to join their group, the Aryan Brotherhood. Bogard testified that he understood this question as an inquiry into whether he would help them murder Lehman.[11]

Bogard testified that, on the evening of the murder, he watched from his cell as Lehman was lured to the area where Defendant and the other indicted co-conspirators were standing and that one of the men, Gillespie, grabbed Lehman from behind while Perry made a stabbing motion towards Lehman's eye.

On January 19, 1989, at the conclusion of the three-day trial before a jury in the Circuit Court of Cabell County,[12] Defendant was convicted of the conspiracy charge.[13]

On January 21, 2000, June 23, 2000, and May 30, 2001,[14] Defendant, by counsel, filed amended petitions for post-conviction habeas corpus relief.[15] An omnibus habeas corpus hearing was conducted in the Circuit Court

10. Contrary to Jackson's testimony, defense witness Doug Swisher testified that while he and Jackson were both inmates at Huttonsville, Jackson admitted to Swisher that Defendant was not involved in Lehman's murder "that he knew of." According to Swisher, Jackson told him that he was planning to testify against Defendant because Jackson and Defendant had "had words before and [Defendant] wanted to jump on him and that he was trying to get—cutting his time break, you know, his time that he was sentenced for." We note that, at the time of trial, Swisher was on parole. Consequently, he testified wearing civilian clothing and was not physically restrained.

11. Bogard did not agree to help with Lehman's murder.

12. Though Defendant was indicted on the conspiracy charge in the Circuit Court of Marshall County, the matter was transferred to the Circuit Court of Cabell County upon a motion for change of venue.

13. Following Defendant's conspiracy conviction, a second recidivist information was filed against him based upon the felonies set forth in the first recidivist information. Defendant ultimately entered into a plea agreement under which he agreed to acknowledge his three prior felony convictions and also waived the recidivist trial, as provided for in W.Va.Code § 61–11–19 (1943) (Repl.Vol.2005). He was given a second life recidivist sentence, which was ordered to run consecutively to the first. Defendant later challenged the second life recidivist sentence in a petition for writ of habeas corpus, which he filed with this Court on or about July 3, 1991. Defendant's request for habeas relief was denied in Gibson v. Legursky, 187 W.Va. 51, 415 S.E.2d 457 (1992). See Id., at syl. pt. 2, 415 S.E.2d 457 (holding that " '[d]ouble jeopardy principles are not offended merely because earlier convictions used to establish a recidivist conviction are subsequently utilized to prove a second recidivist conviction.' ")

14. On August 21, 2000, Defendant, by counsel, filed Checklist of Grounds Asserted or Waived in Post–Conviction Habeas Corpus Proceeding, pursuant to the West Virginia Post–Conviction Habeas Corpus Act, W.Va.Code §§ 53–4A–1 to –11 (Repl.Vol.2000), and Losh v. McKenzie, 166 W.Va. 762, 277 S.E.2d 606 (1981).

15. Defendant, pro se, twice filed post-conviction writs of habeas corpus ad subjiciendum in the Circuit Court of Marshall County. That court dismissed both petitions on the ground that Marshall County was not a convenient forum. By order entered October 7, 1993, the court directed Defendant to seek relief in the Circuit Court of Cabell County, the court in which he was tried and convicted. Present counsel was appointed to represent Defendant in the habeas corpus proceeding by order entered in Cabell County Circuit Court on November 16, 1993.

of Cabell County on June 7, 2001, before the Honorable David M. Pancake, Judge.

Defendant asserted ten grounds for relief in connection with his habeas petition. The habeas court deemed three of them to be meritorious. The court found that the trial court erred in allowing the State's incarcerated witnesses to testify at trial in civilian attire and without shackles while ordering the Defendant's incarcerated witnesses to appear wearing both prison clothing and shackles;[16] in admitting a post-mortem photograph of the murder victim because it was not relevant and had no probative value; and in denying Defendant's motion for a continuance after the State disclosed the trial transcripts of a coconspirator four days before trial.

In granting the Defendant's petition for writ of habeas corpus, the court concluded that although the foregoing errors, individually, were not sufficient to award Defendant the requested relief, the combination of the three errors "constitute cumulative error on a scale that denied [Defendant] his constitutional right to a fair and impartial trial."

In this appeal from the May 10, 2006 Opinion Order Granting Writ of Habeas Corpus, we find that in allowing the State's key witnesses to testify in civilian attire and without shackles while key witnesses for the Defendant testified in prison clothing and were ordered to be bound and shackled at trial, the trial court violated the Defendant's con-

stitutional right to a fair trial. Therefore, we affirm the granting of the writ.[17]

## II. Standard of Review

■ Our consideration of this appeal is guided by the following standard of review:

In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Mathena v. Haines,* 219 W.Va. 417, 633 S.E.2d 771 (2006).

## III. Discussion

■ The crime for which Defendant was tried and convicted occurred while he was an inmate in the State Penitentiary at Moundsville. The State and Defendant presented different theories regarding how inmate Danny Lehman was murdered, who murdered him, and whether Defendant was involved in a conspiracy to commit the murder. Not surprisingly, the most crucial evidence on these issues consisted almost exclusively of the testimony of witnesses who were inmates at Moundsville when the murder occurred. Defendant called seven witnesses who were incarcerated at Moundsville at the time of trial; all seven were shackled[18] and wore

16. Despite this ruling by the habeas court, as previously noted, the trial court's April 17, 1989, post-trial order addressed only the use of shackles on the Defendant's witnesses. The order indicated that the defense witnesses transported from Moundsville were to remain bound and shackled; this order did not also require these witnesses to testify wearing prison attire. It is undisputed, however, that the witnesses wore prison garb during their testimony.

17. Because we affirm the granting of the writ on the issue of prison garb and shackles, we need not address the remaining issues of whether the trial court committed error in denying Defendant's motion to continue and in admitting a post-mortem photograph of the victim.

18. As previously noted, defense counsel objected to the shackling of the defense witnesses. In *State ex rel. McMannis v. Mohn,* 163 W.Va. 129, 139 n. 7, 254 S.E.2d 805, 810 n. 7 (1979), we outlined numerous factors which have been con-

sidered in determining whether physical restraints should be placed on a testifying witness:

"(1) [T]he seriousness of the present charge, (2) the person's character, (3) the person's past record, (4) past escapes by the person, (5) attempted escapes by the person, (6) evidence the person is planning an escape, (7) threats of harm to others, (8) threats to cause disturbance, (9) evidence the person is bent upon self-destruction, (10) risk of mob violence, (11) risk of attempted revenge by victim's family, (12) other offenders still at large, ..." [Citations omitted]

*Id.* (*quoting* A.B.A. Advisory committee on the Criminal Trial, *Standards Relating to Trial by Jury* at 96 n. 9 (Approved Draft 1968)). *See State v. Allah Jamaal W.,* 209 W.Va. 1, 543 S.E.2d 282 (2000), which significantly post-dates Defendant's criminal trial, but in which this Court provides further guidance regarding whether an incarcerated witness should be required to wear prison attire and/or shackles while testifying, in-

prison garb [19] while they testified. The State called two inmates as witnesses; these key witnesses testified wearing civilian clothing and were not forced to wear shackles in front of the jury.

■ In West Virginia "[a] criminal defendant has no constitutional right to have his witnesses appear at trial without physical restraints or in civilian attire." Syl. Pt. 3, *State ex rel. McMannis v. Mohn*, 163 W.Va. 129, 254 S.E.2d 805 (1979), *cert. denied*, 464 U.S. 831, 104 S.Ct. 110, 78 L.Ed.2d 112 (1983). Though this general principle of law remains sound, it is not absolute. In *McMannis*, we recognized that "there may be occasions when forcing the defendant's witnesses to testify in physical restraints [or prison attire] may create sufficient prejudice that reversible error will occur." 163 W.Va. at 140, 254 S.E.2d at 811. *See State v. Allah Jamaal W.*, 209 W.Va. 1, 4, 543 S.E.2d 282, 285 (2000). We find that under the unique facts presented, there was sufficient prejudice to Defendant's case which resulted in a violation of his constitutional right to a fair trial and, therefore, constituted reversible error.

The critical evidence regarding whether Defendant was a co-conspirator in the murder of Danny Lehman was provided by a procession of incarcerated witnesses who testified on behalf of both Defendant and the State. Thus, this case was largely a credibility battle, and the jury's verdict hinged on whose version of events the jury chose to believe. *See Knott v. State*, 349 Md. 277, 708 A.2d 288, 295 (1998). Accordingly, this Court cannot understate the impact on the jury of the glaring disparity in the witnesses' physical appearance. Indeed, in *Allah Jamaal W.*, we acknowledged that,

> [t]he prejudice to a defendant from requiring one of his witnesses to testify in handcuffs lies in the inherent psychological impact on the jury, not merely in the fact that the jury may suspect that the witness committed a crime. . . . [T]he jury is necessarily prejudiced against someone appearing in restraints as being in the opinion of the judge a dangerous man, and one not to be trusted, even under the surveillance of officers.

209 W.Va. at 7–8, 543 S.E.2d at 288–89 (*quoting Williams v. State*, 629 P.2d 54, 57–58 (Alaska 1981)).[20] Likewise, in *McMannis*, we recognized that " '[i]n the minds of the jurors the credibility of [incarcerated witnesses required to testify in prison attire] can be affected in the same manner as the [defendant's] presumption of innocence can be diminished by the defendant's appearance in prison garb.' " 163 W.Va. at 135–36, 254 S.E.2d at 809 (*quoting State v. Yates*, 174 Conn. 16, 381 A.2d 536, 537 (1977)). Other courts have also recognized the risk of unfair prejudice to a defendant whose witnesses are forced to testify in prison garb or restraints. *See Harrell v. Israel*, 672 F.2d 632, 635 (7th Cir.1982) ("Although the shackling of defense witnesses may be less prejudicial to the accused because it does not directly affect the presumption of innocence, it nevertheless may harm his defense by detracting from his witness' credibility."); *Commonwealth v. Brown*, 364 Mass. 471, 305 N.E.2d 830, 834 (1974) ("The shackling of a witness . . . may influence a jury's judgment of credibility and further hurt the defendant in so far as the witness is conceived to be associated with him."); *Hightower v. State*, 123 Nev. 55, 154 P.3d 639, 641 (2007) ("[R]equiring an incar-

---

cluding, *inter alia*, the burdens and responsibilities of both defense counsel and the trial court in such cases.

**19.** We stated in *McMannis* that

[b]ecause prison witnesses do not appear in court without some prior arrangement with the custodial authorities, we believe that it is incumbent upon defense counsel, if he wishes to obtain prison witnesses, to make voluntary arrangements with the custodial authorities for them to appear in civilian attire. If a voluntary arrangement cannot be made, he should move the court for an order in advance of trial.

163 W.Va. at 137 n. 3, 254 S.E.2d at 809 n. 3. Obviously, defense counsel made no such arrangements with the custodial authorities for defense witnesses to appear in civilian attire, nor does it appear from the record before us that any motion in that regard was made in advance of trial.

**20.** *See McMannis* (a witness wearing "physical restraints marked the person as a violent criminal, which would seriously affect his credibility in the jury's mind."). 163 W.Va. at 138, 254 S.E.2d at 810.

cerated defense witness to appear in prison clothing may prejudice the accused by undermining the witness's credibility in an impermissible manner."); *State v. Hartzog*, 96 Wash.2d 383, 635 P.2d 694, 703 (1981) ("While a shackled witness may not directly affect the [defendant's] presumption of innocence, it seems plain that there may be some inherent prejudice to defendant, as the jury may doubt the witness' credibility.").

 Under the unique facts of this case, where seven crucial defense witnesses testified before the jury in prison garb and shackles while the State's two key witnesses testified in civilian clothing and without shackles, it would be illogical to conclude that the witnesses' contrasting appearance did not appreciably impact the jury's assessment of the witnesses' credibility. As this Court pointed out in *Allah Jamaal W.*, "[r]egardless of how credible the testimony of these witnesses may have been, ... it [is] unlikely that the jury would find their testimony credible." 209 W.Va. at 7, 543 S.E.2d at 288. As we held in syllabus point two of *State v. Varner*, 212 W.Va. 532, 575 S.E.2d 142 (2002), " ' "[t]he right to a trial by an impartial, objective jury in a criminal case is a fundamental right guaranteed by the Sixth 'and Fourteenth Amendments of the United States Constitution and Article III, Section 14 of the West Virginia Constitution." Syllabus point 4, [in part,] *State v. Peacher*, 167 W.Va. 540, 280 S.E.2d 559 (1981).' Syllabus point 4, in part, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994)." "And the question of whether a jury is impartial is dependent upon whether the jurors are free from bias or prejudice either for or against the accused." *State v. McClure*, 184 W.Va. 418, 421, 400 S.E.2d 853, 856 (1990) (*citing State v. Pratt*, 161 W.Va. 530, 244 S.E.2d 227 (1978), and *State v. Hatfield*, 48 W.Va. 561, 37 S.E. 626 (1900)). Accordingly, the drastic contrast in the physical appearance of the parties' incarcerated witnesses—each of whom provided crucial testimony at trial—unfairly influenced the jury's judgment of the witnesses' credibility. As a result, Defendant's constitutional right to a fair trial was clearly violated. Accordingly, we affirm the lower court's order granting Defendant's petition for writ of habeas corpus.[21]

### IV. Conclusion

For the reasons stated above, the order entered May 10, 2006, is hereby affirmed.

Affirmed.

Justice BENJAMIN dissents and reserves the right to file a dissenting opinion.

BENJAMIN, Justice, dissenting:

(Filed June 23, 2008)

"A criminal defendant has no constitutional right to have his witnesses appear at trial without physical restraints or in civilian attire." Syl. pt. 3, *State ex rel. McMannis v. Mohn*, 163 W.Va. 129, 254 S.E.2d 805 (1979), *cert. denied*, 464 U.S. 831, 104 S.Ct. 110, 78 L.Ed.2d 112 (1983). Despite this well-established principle, the majority grants habeas corpus relief to Gary Allen Gibson (hereinafter "the defendant") on the basis that a number, but not all, of his incarcerated witnesses testified at trial in prison attire and shackles. In general, habeas corpus relief, such as that sought in this proceeding, is not available to correct ordinary trial error, but is reserved for addressing constitutional vio-

---

21. Finally, we note that, as a general principle, it is within the sound discretion of a trial court to determine whether a defense witness should be required to testify wearing prison attire and/or shackles. *See* Syl. Pt. 3, *Allah Jamaal W.* However, in order for this Court to determine if a trial court abused its discretion, there must be some clear indication in the record which sufficiently justifies the court's decision. In the instant matter, the trial court required every witness being transported from Moundsville to "remain bound and shackled." The trial court's April 17, 1989, order also stated, without more, that all of these witnesses were shackled for unidentified "security reasons." Although the trial court may have had sufficient reasons for ordering the witnesses shackled, we find the stated basis for its ruling to be woefully inadequate. Rather, for appellate review purposes, the trial court should have articulated reasons for the shackling which were specific to each individual witness. See n. 18, *supra*. *See also Allah Jamaal W.*, 209 W.Va. at 7, 543 S.E.2d at 288. (After defense counsel made a timely motion to permit incarcerated defense witnesses to testify in civilian attire and without shackles, the trial court denied the motion without "provid[ing] any relevant reason for the denial," Because the record was silent as to the trial court's decision to deny the motion, we concluded that such denial was an abuse of discretion.)

lations. See, Syl. pt. 4, *McMannis*, 163 W.Va. 129, 254 S.E.2d 805 ("A habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed."); *Pethel v. McBride*, 219 W.Va. 578, 588–9, 638 S.E.2d 727, 737–8 (2006) ("The right to habeas relief is, by necessity, limited. If it were not, criminal convictions would never be final and would be subject to endless review.... Accordingly, habeas relief is available only where: (1) there is a denial or infringement upon a person's constitutional rights; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the legal maximum; or (4) the conviction would have been subject to collateral attack by statute or at common-law prior to the adoption of W. Va.Code § 53–4A–1."). Recognizing that the physical appearance of these witnesses when testifying does not, standing alone, rise to a constitutional level, the majority finds that *under the facts of this case*, it impacted the defendant's constitutional right to a fair trial because the State's incarcerated witnesses were permitted to testify in civilian clothing and unshackled. However, *the facts of this case*, demonstrate that there was no violation of the defendant's constitutional right to a fair trial and that valid reasons existed for those incarcerated defense witnesses to appear and testify in prison attire and shackles.

Defendant was tried and convicted in January 1989 in the Circuit Court of Cabell County[1] for conspiracy to commit the murder of Danny Lehman.[2] Mr. Lehman's murder occurred on November 26, 1986, in the North Hall of the West Virginia State Penitentiary at Moundsville (hereinafter "Moundsville"), where the defendant was serving a life sentence. On January 1, 1986,

the worst prisoner riot in the history of Moundsville occurred.[3] In March 1986, this Court issued an opinion in *Crain v. Bordenkircher*, 176 W.Va. 338, 342 S.E.2d 422 (1986), finding the conditions at Moundsville unconstitutional. In November 1988, finding the conditions at Moundsville had not improved, this Court ordered the facility closed by July 1, 1991. *Crain v. Bordenkircher*, 180 W.Va. 246, 247–8, 376 S.E.2d 140, 141–2 (1988).[4] In light of the publicity surrounding the January 1986 riots and this Court's ordering that Moundsville be closed, the dangerous nature of the facility and persons incarcerated therein was undoubtedly well-known to the jurors without comment from anyone.

Of the seven defense witnesses who testified at defendant's trial, six were incarcerated at Moundsville at the time of trial. All six were serving life sentences, two of these witnesses were housed in maximum security and the remaining four were housed in the general population. These six witnesses testified wearing prison attire and shackled. The seventh defense witness, who was incarcerated at the Huttonsville Correctional Facility at the time of trial, testified wearing civilian attire with no physical restraints. In order to testify, the Moundsville inmates were required to be transported approximately 200 miles from the Moundsville facility to Cabell County. While in Cabell County, they were held in an unsecure courtroom, not in a jail cell, while awaiting their turn to testify and return to Moundsville. The record does not include a motion by the defendant to have the Moundsville witnesses appear in civilian attire or unrestrained, nor does it include evidence that the defendant attempted to arrange their appearance in civilian attire with custodial authorities. A

---

1. Although the defendant was indicted in the Circuit Court of Marshall County, the matter was transferred to the Circuit Court of Cabell County upon a motion for a change of venue.

2. Mr. Lehman was stabbed in his right eye, with the knife penetrating his skull bone and brain. The cause of death was "a stab wound of the brain through the right eye."

3. This riot was started by a prison gang known as the "Avengers." The decedent was the leader of the Avengers. This riot lasted 42 hours, in-

volved the deaths of three inmates and seventeen people being held hostage before being released unharmed.

4. Due to delays in construction of a new maximum security facility, this order was subsequently modified to establish a October 31, 1994, closure date. *See, Crain v. Bordenkircher*, 187 W.Va. 596, 420 S.E.2d 732 (1992); *Crain v. Bordenkircher*, 191 W.Va. 583, 447 S.E.2d 275 (1994).

post-trial order was entered, however, on April 17, 1989, stating, in pertinent part, that "[p]rior to the presentation of evidence and testimony by the Defense, the Court ordered that witnesses for the defendant, those who were inmates transported from the Penitentiary at Moundsville, would remain bound and shackled for security reasons, to which ruling the defendant, by counsel, objects and excepts."

With respect to the disparity in appearance between the States's two incarcerated witnesses and six of the seven incarcerated defense witnesses, two things are clear. First, the jury was informed that the two State witnesses who appeared in civilian clothing and unrestrained were incarcerated at the Huttonsville Correctional Center at the time of their testimony and had been given special consideration in exchange for their testimony. Second, the judge gave a strong cautionary instruction prior to the presentation of the defense witnesses that their physical appearance was not to impact judgment of their credibility.[5]

This trial occurred nearly twelve years before this Court issued its decision in *State v. Allah Jamaal W.*, 209 W.Va. 1, 543 S.E.2d 282 (2000), wherein guidelines for the appearance of defense witnesses in prison attire and physical restraints were established. Nevertheless, the record herein demonstrates that, under the facts of this case, these guidelines were met. In Allah Jamaal W., this Court stated:

In view of *McMannis* and other authorities, we hold as follows. The issue of whether a witness for the defendant should be physically restrained or required to wear prison attire while testifying before a jury is, in general, a matter within the sound discretion of the trial judge and will not be reversed absent a showing of an abuse of that discretion. The trial judge should not permit an incarcerated defense witness to appear at trial in the distinctive attire of a prisoner. However, the burden is upon the defendant to timely move that an incarcerated witness be permitted to testify at trial in civilian clothes. If the trial judge denies the motion, the judge must set forth on the record the reasons for denying said motion. An incarcerated defense witness should not be subjected to physical restraint while in court unless the trial judge has found such restraint reasonably necessary to prevent escape, provide safety, or maintain order in general. The burden is upon the defendant to timely move that an incarcerated defense witness be permitted to testify at trial without physical restraints. If the trial judge orders such restraint, the judge must enter into the record of the case the reasons therefor. Whenever the wearing of prison attire or physical restraint of a defense witness occurs in the presence of jurors trying the case, the judge should instruct those jurors that such attire or restraint is not to be considered in assessing the evidence and determining guilt.

*Allah Jamaal W.*, 209 W.Va. at 6–7, 543 S.E.2d at 287–8. In the instant matter, there is no evidence that the defendant made a motion to either have the Moundsville witnesses appear in civilian attire or unrestrained, these men posed significant security risks readily apparent to the trial court, the jury and the public in general, and the judge issued the proper cautionary instruction. I do not see where the trial judge abused his discretion in permitting these witnesses to testify in prison attire and shackles. Nor do I agree that the disparity in appearance between the State's incarcerated witnesses and some of the defense incarcerated witnesses, under the facts of this case which

---

5. The instruction provided:

[l]adies and gentlemen, there will be a number of witnesses who will testify at this time, who are inmates at Moundsville. It has been my decision that they shall testify in shackles. I don't want you to be prejudiced by that or to allow the fact that they are in shackles to influence in anyway, shape, or form the manner in which you receive their testimony. It is, however, a measure I think that is proper under the circumstances and that I believe I've done for good and just cause, and I trust that given the orientation you had at the beginning that you can remove that from your mind and not allow it to influence your judgment relative to their testimony.

involved a murder in the Moundsville Penitentiary, rises to the level of a constitutional infringement of the defendant's right to a fair trial. The jury was well aware of who all witnesses were and their crimes. As such, I respectfully dissent from the majority's decision to grant habeas corpus relief herein.